# NOTICE:  SLIP OPINION
## (not the court's final written decision)

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

MARJORIE CARROLL, individually and as Personal Representative of the Estate of LAWRENCE W. CARROLL, Deceased,

      Appellant/Cross-Respondent,

      v.

AKEBONO BRAKE CORPORATION; AKEBONO BRAKE INDUSTRY, LTD.; HONEYWELL INTERNATIONAL, INC., individually and as successor-in-interest to Bendix Corporation; NISSAN MOTOR COMPANY LTD.; NISSAN NORTH AMERICA, INC.; OLYMPIC BRAKE SUPPLY,

      Respondents/Cross-Appellants,

BORGWARNER MORSE TEC, LLC; CLIFFORD PERFORMANCE; COOPER INDUSTRIES, LLC, individually and as successor-in-interest to McGraw Edison Company; DANA COMPANIES, LLC, f/k/a/ DANA CORPORATION; EXEDY CORPORATION OF JAPAN, individually and as successor-in-interest to Daikin Clutch Corporation; EXEDY GLOBALPARTS CORPORATION, as a wholly-owned subsidiary of the EXEDY CORPORATION OF JAPAN, and as successor-in-interest to Daikin Clutch Corporation; GENUINE PARTS

DIVISION ONE

No. 82245-4-I

PUBLISHED OPINION

No. 82245-4-I/2

COMPANY; HENNESSY INDUSTRIES,
INC.; JACK CLIFFORD
PERFORMANCE PRODUCTS INC.;
LuK CLUTCH SYSTEMS LLC;
METROPOLITAN LIFE INSURANCE
COMPANY; SIX ROBBLEES' INC.; and
UNION CARBIDE CORPORATION,

Defendants.

DWYER, J. — Marjorie Carroll appeals from the trial court's order granting the motion filed by Nissan Motor Company Ltd. and Nissan North America, Inc. (collectively Nissan) to strike Carroll's complaint. In its motion to strike the complaint, Nissan asserted that Carroll and her counsel engaged in numerous willful and deliberate discovery violations that substantially prejudiced Nissan's ability to prepare for trial. On appeal, Carroll contends that the trial court abused its discretion by striking the complaint because none of the alleged violations met all of the standards required for a trial court to impose extreme sanctions under CR 37(b). Additionally, Carroll asserts that the trial court failed to consider as a lesser sanction an adverse inference jury instruction that would have cured any prejudice resulting from the alleged discovery violations. We agree with Carroll in both of these respects. Accordingly, we reverse the order striking Carroll's complaint and remand the cause for further proceedings.

On cross appeal, Nissan asserts that the trial court erred by limiting a monetary sanction that was imposed on one of Carroll's attorneys, Thomas Owens, to $1,000. Because the trial court did not err in this respect, we affirm the trial court's order sanctioning Owens.

2

No. 82245-4-I/3

I

On October 19, 2015, a physician diagnosed Marjorie Carroll's husband, Lawrence Carroll, as being afflicted by mesothelioma. Lawrence[1] died on April 18, 2016. He was 82 years old.

On the day of Lawrence's death, Carroll signed a form authorizing Regional Pathology and Autopsy Services, Inc. (RPAS) to conduct an autopsy of Lawrence. The authorization form provided that the reason for the autopsy was "Disease Litigation." The autopsy was paid for with a credit card belonging to one of Carroll's attorneys, Erik Karst. Karst is licensed to practice law in Texas and Minnesota.

The autopsy authorization form provided:

I understand and agree that <u>after</u> a period of six months immediately following the transmittal of the autopsy final report, any remaining tissue samples, fluids, and/or devices, will, without further notice, be made available to medical researchers instead of being destroyed. I understand that if retained, toxicology specimens and/or samples for DNA/molecular studies shall be stored for six months and then shall be destroyed without further notice. I understand that glass slides and histology blocks shall be retained indefinitely.

On April 21, 2016, three days after Lawrence's death, the autopsy was performed. A report of the autopsy, which was dated June 25, 2016, stated that Lawrence's cause of death was "MALIGNANT PLEURAL MESOTHELIOMA WITH METASTASIS." The report did not specify the exact type or types of asbestos fibers that were present in Lawrence's body. Subsequently, Dana

---

[1] For clarity, we refer to Mr. Carroll by his first name. Given her role as plaintiff, we refer to Marjorie Carroll as Carroll. No disrespect is intended.

3

No. 82245-4-I/4

Carroll, Carroll's daughter, sent the autopsy report to Karst via an e-mail message dated July 19, 2016.

The autopsy report stated that various forms of tissue samples were retained by RPAS following the autopsy. The trial court later found that "RPAS retained 35 slides of the partial autopsy but, six months later, pursuant to its policy gave *all* remaining unclaimed tissue and fluid to medical research."[2] Finding of Fact 6 (emphasis added).

The trial court found that Nissan "had located the autopsy report on their own in 2019."[3] Finding of Fact 8. A declaration of one of Nissan's attorneys, Virginia Leeper, asserted that RPAS "ceased operations on April 15, 2019." Leeper stated that she "was able to locate and obtain from Illume Pathology . . . documents and 35 slides."[4] Leeper additionally stated that "[t]here were no autopsy photographs, no tissue blocks, no wet lung tissue nor other organs with

---

[2] There is no indication in the record that any remaining tissue samples were actually donated to medical research. The trial court's finding that all remaining tissue samples were donated to medical research appears to be based on the RPAS's retention policy, which states that "after a period of six months immediately following the transmittal of the autopsy final report, any remaining tissue samples . . . will . . . be *made available* to medical researchers." (Emphasis added.) However, in a declaration in support of its motion to strike the complaint, Nissan's attorney stated that "I have not been able to determine if Plaintiff's counsel or anyone else has possession of autopsy specimens or tissue samples, or if they have all been destroyed." Additionally, in its motion to strike the complaint, the only citations that Nissan provided in support of its claim that all remaining tissue samples were donated to medical research were to the autopsy authorization form, which, as explained, stated only that the remaining tissue samples would be made available to medical researchers. In any event, neither party assigns error to the trial court's finding that RPAS "gave all remaining unclaimed tissue and fluid to medical research." Finding of Fact 6. Thus, this finding is a verity on appeal. See Pierce v. Bill & Melinda Gates Found., 15 Wn. App. 2d 419, 429, 475 P.3d 1011 (2020) ("'It is well-established law that an unchallenged finding of fact will be accepted as a verity upon appeal.'" (quoting State v. Hill, 123 Wn.2d 641, 644, 870 P.2d 313 (1994))), review denied, 197 Wn.2d 1006 (2021).

[3] Nissan asserts that the trial court mistakenly found that the autopsy report was obtained in 2019. However, Nissan did not assign error to this factual finding in its brief. See RAP 10.3. Thus, it is a verity on appeal. See Pierce, 15 Wn. App. 2d at 429.

[4] There is no indication in the record as to what material was contained within these slides or what information was contained within the documents obtained by Leeper.

4

the materials" that she obtained. According to Leeper, she was "not . . . able to determine if Plaintiff's counsel or anyone else has possession of autopsy specimens or tissue samples, or if they have all been destroyed." On appeal, the parties agree that these tissue samples were likely destroyed.[5] However, there is no indication in the record as to when, exactly, any unclaimed tissue samples or retained histology blocks were destroyed by RPAS, Illume Pathology, or some unidentified third party.

On April 28, 2016, Lawrence's body was cremated. That same day, Lawrence's death certificate was issued. The death certificate erroneously stated that no autopsy had been performed.

Between October 2017 and March 2018, Karst, on behalf of Carroll, filed claims against five bankruptcy court trusts. The trial court herein found that, in those bankruptcy trust proceedings, Carroll "claimed Lawrence Carroll's mesothelioma was caused by his exposure to asbestos as a child, from his father's shipyard work clothes, while hugging and playing with his father and helping his mother launder his father's work clothes." Finding of Fact 11.

On April 10, 2018, Carroll, individually and as the personal representative of her husband's estate, filed a complaint against Nissan Motor Company Ltd., Nissan North America (collectively Nissan), and various other defendants in King County Superior Court. This complaint provided that "Plaintiff claims liability based upon the theories of product liability, including strict product liability under

---

[5] In her opening brief, Carroll states that "the autopsy tissue had been destroyed under RPAS's standard policy." Br. of Appellant at 19. In its response brief, Nissan states that "[t]he tissue blocks collected in the autopsy were missing and apparently destroyed." Br. of Resp't at 10.

Section 402A of the Restatement (Second) of Torts, and negligence." According to the complaint, Lawrence worked from 1971 to 1989 as a service and parts manager at several vehicle dealerships that were owned and operated by Nissan. The complaint alleged that Lawrence was exposed to asbestos while working at these dealerships. Thomas Owens, a member of the Washington bar, signed the complaint. Karst was listed on the complaint as "of counsel."[6]

King County Superior Court's 2011 revised consolidated pretrial style order applicable to asbestos litigation required "[p]laintiffs' counsel" to "execute a stipulation for the release of employment related records," including "social security records," to "counsel for all parties within 90 days of filing the Complaint." On June 11, 2018, prior to Nissan being served with a summons and 62 days after the complaint was filed, Karst's paralegal sent an e-mail message to the attorneys for all defendants who, at that time, had filed a notice of appearance. This e-mail message contained medical and billing records. Although this e-mail message stated that "updated authorizations" were also attached, such authorizations were, according to a declaration of Karst's paralegal, inadvertently not attached to this message.

On September 28, 2018, Carroll's attorneys submitted answers to style interrogatories that were required to be answered under King County Superior Court's 2018 second revised consolidated pretrial style order. Carroll subsequently verified with her signature the veracity of the answers to these style

---

[6] On October 12, 2020, the superior court entered an order admitting Karst to practice in Washington pro hac vice.

No. 82245-4-I/7

interrogatories.[7]  Interrogatory 20 requested that Carroll attach a copy of any death certificate to her response.  Accordingly, Carroll attached a true copy of Lawrence's death certificate.  Next, interrogatory 21 requested that Carroll attach a copy of any autopsy report.  Carroll answered, "Not Applicable."  Additionally, interrogatory 22 requested that Carroll provide information regarding any specimens or tissue samples taken or retained from any autopsy.  Carroll again answered, "Not Applicable."

On October 9, 2018, six months after Carroll filed her complaint, Nissan Motor Company Ltd. was finally served with a summons.[8]  This delay in service resulted from Nissan's insistence that it be served according to the dictates of the Hague Convention.  Sometime thereafter, both Nissan Motor Company Ltd. and Nissan North America, Inc. filed notices of appearance.[9]  On October 24, 2018, Karst's paralegal sent updated authorizations "to counsel who had appeared in the case at that time."  The parties agree that this did not include Nissan.

Also on October 24, 2018, Leeper sent an e-mail message to Owens.  In this message, Leeper introduced herself as counsel for Nissan Motor Company Ltd.  Leeper also sought "to find out the status of the case" and asked whether "records authorizations [had] been provided as required under the style rules."  The next day, Owens responded, "I no longer use or monitor this old AOL

---

[7] Carroll signed the answers to these interrogatories on October 10, 2018.  The answers were prepared by her lawyers or members of their staff.

[8] The record does not contain a copy of the summons that was served on Nissan North America, Inc.  However, according to Nissan's motion to strike Carroll's complaint, Nissan North America, Inc. "was not served until approximately August 28, 2019."

[9] The record does not contain the notices of appearance filed by these Nissan entities. However, according to a motion that was filed by Carroll in the superior court, "Nissan Motor Co. Ltd. did not file a notice of appearance . . . until December 10, 2018," and "Nissan North America Inc. did not file a notice of appearance until August 28, 2019."

account - please use my gmail address only."[10] Owens then directed Nissan's counsel to contact Cheryl Guckian, a legal assistant at Karst's law firm, for the status of the records authorizations. That same day, Leeper responded, "Thank you." The record does not contain an e-mail message sent by Leeper to Guckian requesting any records authorizations.

On December 21, 2018, Leeper sent an e-mail message to Owens wherein she attached a letter "requesting plaintiff [to] preserve[] all tissue relevant to Mr. Carroll's alleged mesothelioma and notice prior to any destructive testing being conducted." In this letter, Leeper stated, "If you object to preservation of any relevant tissue and/or prior notice of destructive testing, kindly notify us by close of business on January 4, 2019, so we may take appropriate action with the court." According to a declaration of Leeper, Owens "never responded to [this] letter." However, Leeper sent this e-mail message to the same e-mail address that Owens had previously informed Leeper that he neither used nor monitored rather than utilizing the then-correct e-mail address he had furnished her.

On January 31, 2019, Nissan served Carroll with its first interrogatories and requests for production. One of these requests for production stated: "Please produce copies of all applications and supporting documents submitted to any bankruptcy trust by or on behalf of the plaintiff or the claims of the plaintiff herein." On June 3, 2019, Owens signed answers to these interrogatories and requests for production. Simultaneously, Owens provided certain releases for

---

[10] In this e-mail message, Owens provided an alternate e-mail address to Leeper.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

the bankruptcy trust claims. On June 14, 2019, Nissan sent a second request for production seeking further documentation concerning the bankruptcy trust claims. On July 12, 2019, Carroll provided Nissan with all of the remaining documentation related to these claims. According to the declaration of Leeper, "Nissan Entities had no knowledge of decedent's exposure to asbestos from his father's shipyard work clothes during WWII" until Carroll produced the documentation relating to the bankruptcy trust claims on July 12.

On May 28, 2019—before Carroll responded to Nissan's first interrogatories and requests for production—Leeper participated in a CR 26(i) conference with Karst. During this conference, according to her declaration, Leeper requested Karst to provide Nissan with "a current authorization form . . . to obtain Lawrence Carroll's social security records." Three days later, according to the declaration of Leeper, "Plaintiff's counsel produced the social security records of Lawrence Carroll he had in his possession." Subsequently, on July 7, 2019, Leeper sent an e-mail message to Karst and Owens "checking on the status of the updated medical, employment, etc. authorizations [that Karst] promised on May 28, 2019." The record does not contain a response from either Karst or Owens to this e-mail message. Then, on July 30, 2019, Leeper sent another e-mail message to Karst and Owens requesting "updated medical, employment, etc. authorizations [that Karst] promised on May 28, 2019." On August 1, 2019, Karst's paralegal provided Leeper with these authorizations.

No. 82245-4-I/10

The initial deadline for disclosure of trial witnesses was April 15, 2019. Approximately six weeks after this deadline, on May 29, Carroll disclosed her trial witnesses to Nissan.

Previously, on March 26, 2019, Nissan deposed Carroll's son, Douglas Carroll. During this deposition, Nissan's counsel asked Douglas whether an autopsy had been performed:

> Q.    Okay.  And when [your father] passed, is there a reason, then, why an autopsy was not performed?
> A.    I thought there was.  I -- I don't know.
> Q.    Other than anything told to you by an attorney or from Mr. Karst or his firm, did anyone else tell you not to have an autopsy performed?
> A.    I wasn't involved.
> Q.    Who made that decision, do you know, regarding not having an autopsy?
> A.    I'm not -- my mom.  I don't -- I don't know.

Karst, who was present at the deposition, did not inform Nissan that an autopsy had been performed.

On December 19, 2019, Nissan deposed Carroll.  At the time of the deposition, Carroll was over 80 years old and testifying more than three and a half years after her husband had passed away on April 18, 2016.  During this deposition, Nissan's counsel asked Carroll whether an autopsy had been performed:

> Q.    I understand that when your husband passed away there was no autopsy that was done.  Is that correct?
> A.    Yes, they did.
> Q.    They did an autopsy?
> A.    I don't know.  I thought they did.  Maybe they didn't.  I don't know.
> Q.    Okay. But you know that you did not tell anybody "do not do an autopsy"?
> A.    No, I didn't tell anybody that.

10

Carroll's attorney George Kim,[11] who was present at the deposition, did not inform Nissan that an autopsy had been performed.

During the course of discovery, the trial court continued the trial date several times. An original order provided that the discovery cut-off date was August 5, 2019 and the trial date was September 23, 2019. On June 7, 2019, the trial court entered a stipulated order continuing both the discovery cut-off date to December 31, 2019 and the trial date to February 18, 2020. Then, on November 21, 2019, the trial court entered a second stipulated order continuing both the discovery cut-off date to April 20, 2020 and the trial date to June 8, 2020. Finally, due to the COVID-19 pandemic, the trial court, on April 9, 2020, continued both the discovery cut-off date to September 21, 2020 and the trial date to November 9, 2020.

On September 14, 2020, Nissan filed a motion to strike Carroll's complaint as a sanction for Carroll and her counsel committing various alleged discovery violations. This motion also requested an award of monetary sanctions. In its motion, Nissan claimed that:

- Carroll and her counsel willfully destroyed, or allowed to be destroyed, tissue samples from the autopsy;
- Carroll and her counsel failed to disclose information regarding the autopsy in their responses to style interrogatories 16, 21, and 22;
- Carroll and her son, Douglas, provided false and misleading testimony regarding the autopsy during their depositions;
- Carroll and her counsel willfully failed to disclose information regarding the bankruptcy trust claims in response to style interrogatory 13;

---

[11] Kim, an attorney licensed to practice law in California and Oregon, was admitted to practice in Washington pro hac vice on August 20, 2019. He is an attorney in Karst's law firm.

11

- Carroll and her counsel willfully produced false evidence in response to style interrogatory 20, which requested a copy of the death certificate;
- Carroll and her counsel failed to timely disclose Social Security authorizations;
- Carroll and her counsel failed to timely disclose her trial witness list; and
- Carroll and her counsel delayed making both Carroll and an expert witness available for depositions.

Also in this motion, Nissan averred that, "[h]ad Mr. Carroll's lung tissue been preserved, the Nissan Entities could have had their own experts conduct a fiber burden analysis to see if his lungs contained amphibole or chrysotile asbestos fibers and the quantity of those fibers." According to Nissan's motion:

> Datsun and Nissan vehicles' asbestos-containing brakes, clutches, and gaskets contained only commercial chrysotile asbestos fibers that were encapsulated in a bonded matrix. Many products used in the shipyards during WWII, where Mr. Carroll's father worked as a welder, contained amphibole asbestos fibers, a highly carcinogenic type of asbestos fiber that is well documented to cause disease in humans when inhaled.[12]

(Footnotes omitted.)

On October 16, 2020, the trial court heard Nissan's motion to strike the complaint. During the hearing, the trial court expressed its intention to grant the motion. On November 12, 2020, Carroll filed a motion for reconsideration. In this motion, Carroll requested that the trial court "impose the lesser sanction of a

---

[12] In support of these claims, Nissan cited to both (1) the declaration of Leeper, and (2) deposition testimony from an expert witness, Dr. Jacqueline Moline. In her declaration, Leeper stated: "It is my understanding upon information and belief that when Datsun and Nissan brand vehicles had asbestos-containing brakes, clutches and gaskets, the type of asbestos used in those component parts was chrysotile asbestos." By contrast, Dr. Moline testified that the type of asbestos fiber that was generally present in shipyards during the 1940s was amphibole asbestos fiber. However, Dr. Moline also testified that, in shipyards during the 1940s, "chrysotile was used on gaskets and packing and things along those lines." During the deposition, Leeper moved to strike Dr. Moline's response regarding chrysotile asbestos fibers as "non-responsive." This motion was never presented to the trial court for a ruling.

jury instruction that, had tissue from the 2016 autopsy been retained, it would likely have shown the presence of amphibole asbestos fibers." On December 2, the trial court denied the motion for reconsideration without explanation.

On January 19, 2021, the trial court entered its written order granting Nissan's motion to strike Carroll's complaint. In this order, the trial court did not consider or evaluate Carroll's proposal for an adverse inference jury instruction as a lesser sanction. On April 1, the trial court entered an order granting Nissan's motion for an award of attorney fees and costs against Carroll and her attorneys. This order provided that Carroll, Karst, and Kim were jointly and severally liable for an award of $76,477.46 in attorney fees and costs to Nissan.[13] That same day, the trial court entered a separate order awarding Nissan $1,000 in attorney fees and costs against Owens.

Carroll appeals. Nissan cross appeals.

II

Carroll contends that the trial court erred by granting Nissan's motion to strike the complaint. Because none of the conduct that the trial court found to amount to a discovery violation met all of the factors required to justify the imposition of the most severe discovery sanction, we agree.

---

[13] In her opening brief, Carroll assigns error to the trial court's "Order and Judgment for Nissan's attorney fees and costs." Br. of Appellant at 3. However, Carroll does not provide any argument in her brief regarding this order. Accordingly, we decline to review this particular assignment of error. See Satomi Owners Ass'n v. Satomi, LLC, 167 Wn.2d 781, 807-08, 225 P.3d 213 (2009); RAP 10.3(a)(6).

A

The controlling rules of law are easily stated. Their application in particular cases, however, can prove more difficult.

"A trial court exercises broad discretion in imposing discovery sanctions under CR 26(g) or 37(b), and its determination will not be disturbed absent a clear abuse of discretion." Mayer v. Sto Indus., Inc., 156 Wn.2d 677, 684, 132 P.3d 115 (2006). An abuse of discretion occurs when the trial court's decision is manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons. Mayer, 156 Wn.2d at 684. "A discretionary decision rests on 'untenable grounds' or is based on 'untenable reasons' if the trial court relies on unsupported facts or applies the wrong legal standard; the court's decision is 'manifestly unreasonable' 'if the court, despite applying the correct legal standard to the supported facts, adopts a view that no reasonable person would take.'" Mayer, 156 Wn.2d at 684 (internal quotation marks omitted) (quoting State v. Rohrich, 149 Wn.2d 647, 654, 71 P.3d 638 (2003)).

"If a trial court's findings of fact are clearly unsupported by the record, then an appellate court will find that the trial court abused its discretion." Magaña v. Hyundai Motor Am., 167 Wn.2d 570, 583, 220 P.3d 191 (2009). "A trial court's findings of fact are reviewed for substantial evidence, 'which requires that there be a sufficient quantum of evidence in the record to persuade a reasonable person that a finding of fact is true.'" Conway Constr. Co. v. City of Puyallup, 197 Wn.2d 825, 830, 490 P.3d 221 (2021) (quoting Pardee v. Jolly, 163 Wn.2d 558, 566, 182 P.3d 967 (2008)). However, unchallenged findings of fact are treated

14

No. 82245-4-I/15

as verities on appeal. <u>Pierce v. Bill & Melinda Gates Found.</u>, 15 Wn. App. 2d 419, 429, 475 P.3d 1011 (2020). Furthermore, we review conclusions of law de novo. <u>Conway</u>, 197 Wn.2d at 830.

The trial court herein granted Nissan's motion to strike the complaint pursuant to CR 37(b)(2).[14] "The sanction of dismissal for failure to comply with discovery orders is the most severe sanction which a court may apply, and its use must be tempered by the careful exercise of judicial discretion to assure that its imposition is merited." <u>Anderson v. Mohundro</u>, 24 Wn. App. 569, 575, 604 P.2d 181 (1979). Accordingly, we have explained that "Washington courts should not resort to dismissal lightly." <u>Apostolis v. City of Seattle</u>, 101 Wn. App. 300, 305, 3 P.3d 198 (2000).

Indeed, when imposing discovery sanctions, trial courts must be mindful that "'[t]he law favors resolution of cases on their merits.'" <u>Burnet v. Spokane Ambulance</u>, 131 Wn.2d 484, 498, 933 P.2d 1036 (1997) (quoting <u>Lane v. Brown & Haley</u>, 81 Wn. App. 102, 106, 912 P.2d 1040 (1996)); <u>see</u> CR 1. To this end,

> the court should impose *the least severe sanction* that will be adequate to serve the purpose of the particular sanction, but not be so minimal that it undermines the purpose of discovery*; the purpose of sanctions generally are to deter, to punish, to*

---

[14] This rule provides, in pertinent part:

> (2) *Sanctions by Court in Which Action Is Pending.* If a party or an officer, director, or managing agent of a party or a person designated under rule 30(b)(6) or 31(a) to testify on behalf of a party fails to obey an order to provide or permit discovery, including an order made under section (a) of this rule or rule 35, or if a party fails to obey an order entered under rule 26(f), the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:
>
> . . .
>
> (C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceedings or any part thereof, or rendering a judgment by default against the disobedient party.

CR 37(b)(2).

15

No. 82245-4-I/16

> *compensate, to educate, and to ensure that the wrongdoer does not profit from the wrong.*

Burnet, 131 Wn.2d at 495-96 (emphasis added) (citing Wash. State Physicians Ins. Exchange & Ass'n v. Fisons Corp., 122 Wn.2d 299, 355-56, 858 P.2d 1054 (1993)).

Put differently, the "sanction should be proportional to the discovery violation and the circumstances of the case." Magaña, 167 Wn.2d at 590.

With regard to extreme sanctions imposed pursuant to CR 37(b), our Supreme Court has explained:

> If a trial court imposes one of the more "harsher remedies" under CR 37(b), then the record must clearly show (1) one party willfully or deliberately violated the discovery rules and orders, (2) the opposing party was substantially prejudiced in its ability to prepare for trial, and (3) the trial court explicitly considered whether a lesser sanction would have sufficed.

Magaña, 167 Wn.2d at 584 (citing Burnet, 131 Wn.2d at 494).

Notably, the party seeking the imposition of an extreme discovery sanction bears the burden of establishing that the violation was willful or deliberate and that the violation substantially prejudiced that party's ability to prepare for trial. Teter v. Deck, 174 Wn.2d 207, 216-17, 274 P.3d 336 (2012) (citing Burnet, 131 Wn.2d at 494). In Burnet, our Supreme Court explained that a party seeking a severe discovery sanction was not substantially prejudiced in its ability to prepare for trial when, after that party received the information it sought, a significant amount of time remained before trial was set to commence:

> Sacred Heart also cites two post-Fisons decisions in which the Courts of Appeals upheld the respective trial courts' imposition of sanctions for what were considered to be "willful" violations of discovery rules. In one of the cases, Allied Fin. Servs. v. Magnum,

16

> 72 Wn. App. 164, 168, 864 P.2d 1, 871 P.2d 1075 (1993), the trial court excluded witnesses for the defendants because they could not provide an explanation for failing, up to the time of trial, to name any of their witnesses. In the other case, Dempere v. Nelson, 76 Wn. App. 403, 405, 886 P.2d 219 (1994), review denied, 126 Wn.2d 1015 (1995), the trial court excluded a witness that the party identified only 13 days before trial.
>
> . . . [T]he circumstances of this case are far different than those which the Court of Appeals faced in the two above-cited cases. One major difference is that although several years had transpired from the initiation of the Burnets' claim until their expert witnesses were named, deposed, and their opinions [were] clearly identified, a significant amount of time yet remained before trial. That being the case, Sacred Heart could not be said to have been as greatly prejudiced as the non-wrongdoing parties in Allied and Dempere, who engaged in the sanctionable conduct on the eve of trial.[15]

Burnet, 131 Wn.2d at 496.

B

In granting Nissan's motion to strike Carroll's complaint, the trial court concluded that the accumulation of numerous discovery violations met all of the factors set forth in Burnet that are required to be satisfied in order for a trial court to impose severe discovery sanctions. However, a careful review of the record demonstrates that *none* of the conduct that the trial court relied on in dismissing Carroll's claims met all of these factors.

In section III of this opinion, we address various conduct on behalf of Carroll that, contrary to the trial court's findings, did not amount to discovery violations at all. The primary dispute in this appeal concerns whether Carroll had a rule-based duty to retain tissue samples from the autopsy that occurred two

---

[15] In the Burnet case, the depositions occurred in December 1990. 131 Wn.2d at 490. The trial commenced in January 1993. Burnet, 131 Wn.2d at 491. Therefore, when Sacred Heart deposed the witnesses in question, approximately 25 months remained before trial was ultimately set to commence.

17

years before this lawsuit commenced. She did not. No discovery rule or court order could have imposed such a duty on Carroll before she filed her complaint. Indeed, neither our Supreme Court nor the superior courts are authorized to promulgate court rules that impose duties on nonlitigants before a lawsuit commences. To the contrary, it is the legislature that is vested with the authority to impose such duties on the general public. Yet no statute exists which required Carroll to preserve tissue samples before this lawsuit commenced. The superior court exceeded its authority by retroactively imposing such a duty on Carroll.

The trial court also erroneously ruled that Carroll had a duty, pursuant to a King County Superior Court style order applicable to asbestos litigation, to provide Social Security authorizations to Nissan within 90 days after Carroll filed her complaint. Because Nissan insisted on being served process pursuant to the dictates of the Hague Convention, Nissan was not served process—and was thus not subject to the personal jurisdiction of the superior court—until approximately *six months* after Carroll filed her complaint. Having declined to voluntarily submit itself to the court's jurisdiction, Nissan was not entitled to any benefit from any court order prior to becoming subject to the court's authority. The trial court erred by ruling otherwise.

In addition, the trial court abused its discretion both by ruling that Carroll engaged in discovery violations in responding to style interrogatories 13, 16, and 20 and by ruling that Carroll engaged in a discovery violation by not timely making certain witnesses available for deposition.

18

In section IV of this opinion, we address the trial court's ruling that Carroll and her son, Douglas, provided inaccurate and evasive responses during their depositions. Because the evidence in support of finding that these responses were willfully evasive is scant, the trial court erred by deeming the conduct of sufficient culpability to justify the extreme sanction of striking Carroll's complaint.

In section V of this opinion, we address conduct that the trial court properly found to constitute discovery violations. In so doing, we explain that Nissan failed to establish that these violations substantially prejudiced its ability to prepare for trial. Accordingly, these violations did not warrant the extreme sanction of dismissal of Carroll's complaint. Indeed, only the most severe wrongdoing resulting in the most severe prejudice warrants the imposition of the most severe discovery sanction. Carroll did not engage in such severe wrongdoing and Nissan did not establish that it suffered such a degree of prejudice.

Because none of the conduct that Carroll herself engaged in met all of the factors that are required to be satisfied under Burnet for the imposition of severe discovery sanctions, the trial court abused its discretion by imposing the most severe discovery sanction against Carroll. In reaching this decision, we stress that there is ample evidence in the record to support the monetary sanctions that the trial court imposed on Carroll's attorneys. Indeed, Carroll's attorneys engaged in various acts of wrongdoing, which were properly punished by the trial court. We address the misconduct of Carroll's attorneys in section VI.

III

A

The primary dispute in this appeal concerns whether Carroll, personally or through counsel, acted in violation of discovery rules with regard to the autopsy of Lawrence's body and, if so, whether that prejudiced Nissan's ability to prepare its case. In this regard, Carroll first asserts that, contrary to the trial court's findings of fact, she did not engage in a discovery violation by not causing to be preserved any tissue samples from the autopsy that was performed two years before this litigation commenced. We agree.

The trial court found that "RPAS retained 35 slides of the partial autopsy but, six months [after the autopsy was performed], pursuant to its policy gave *all* remaining unclaimed tissue and fluid to medical research." Finding of Fact 6 (emphasis added). The autopsy was performed on April 21, 2016—24 months before Carroll filed her complaint on April 10, 2018.

Leeper's declaration provided that on April 15, 2019—approximately one year after Carroll filed her complaint—RPAS "ceased operations." Nevertheless, Leeper "was able to locate and obtain from Illume Pathology . . . documents and 35 slides." Leeper additionally stated that "[t]here were no autopsy photographs, no tissue blocks, no wet lung tissue nor other organs with the materials" that she obtained from Illume Pathology. According to Leeper, she was "not . . . able to determine if Plaintiff's counsel or anyone else has possession of autopsy specimens or tissue samples, or if they have all been destroyed." As already explained, the parties now agree that any tissue samples have likely since been

No. 82245-4-I/21

destroyed. However, there is no indication in the record as to when, exactly, any unclaimed tissue samples or retained histology blocks were destroyed by RPAS, Illume Pathology, or some unidentified third party.

Significantly, the trial court concluded that Carroll had a duty to retain tissue samples after the autopsy was performed and years before she filed her complaint:

> There is no requirement that there be an autopsy or that samples be retained, *but it is certainly within the spirit of the discovery rules that when an autopsy occurs,* opposing counsel is told (if there is opposing counsel at the time, which in this case there was not) and *samples are retained.* That is simply fair play.

Finding of Fact 23 (emphasis added).[16]

The court also found that Carroll denied Nissan the opportunity to test these tissue samples:

> Because the company that did the autopsy is no longer in existence, the witnesses and the materials are gone. There was a request by Defendants to Plaintiff with regard to preserving all tissue of decedent Lawrence Carroll. By then it was too late, and the Plaintiff never responded. There was a denial of the chance to test the tissue.

Finding of Fact 30.

For several reasons, the trial court erred by ruling that Carroll had a duty to preserve tissue samples from an autopsy that was performed two years before this litigation commenced. First, the rules relied on by the trial court simply did not apply to the conduct of *anyone* prior to the filing of this lawsuit. For its part, Nissan argues that pursuant to section 6.3 of both the 2011 and 2018 King

---

[16] This finding of fact expresses a conclusion of law, which is reviewed de novo. <u>See</u> <u>Casterline v. Roberts</u>, 168 Wn. App. 376, 381, 284 P.3d 743 (2012).

No. 82245-4-I/22

County Superior Court style orders, Carroll "had a duty to preserve Lawrence's remains for testing."[17]  However, the trial court did not rule that Carroll had a duty to retain tissue samples pursuant to the wording of the style orders.  Instead, the trial court ruled that Carroll had a duty to retain tissue samples from the autopsy pursuant to "the spirit of the discovery rules."

In any event, no court rule or style order could have required Carroll to preserve any tissue samples before the litigation commenced (much less retain Lawrence's remains for 24 months pending the filing of a lawsuit).  Indeed, the superior court is not the legislature and, thus, it cannot promulgate court rules that seek to impose duties on the public in general—as opposed to actual litigants.

To the contrary, none of the sources of the judiciary's authority to promulgate court rules authorize courts to adopt rules that apply to nonlitigants before a lawsuit commences.  First, article IV, section 24 of our constitution provides: "The judges of the superior courts, shall from time to time, establish uniform rules for the government of the superior courts."

Nearly a century ago, our Supreme Court defined the scope of this constitutional provision:

> It seems to us that the purpose of § 24 was to insure *uniform* rules of minute procedure, and that it should be construed, not as a grant of power to make broad and general rules, but as a limitation upon the courts requiring that the customary rules having to do with the *minutiæ* of court government should be uniform in character, so that attorney and client should not be hampered by finding petty rules in each court differing according to the views of the particular judge who presided over the tribunal.  That the superior courts have also conceived that this is the correct view may be demonstrated by

---

[17] Br. of Resp't at 38.

22

No. 82245-4-I/23

> an inspection of the rules adopted by the judges of the superior courts from time to time, nearly all of which have for their purpose a uniformity in the details of procedure, so that trials and hearings may be had with the least inconvenience to court and counsel.

State ex rel. Foster-Wyman Lumber Co. v. Superior Court of King County, 148 Wash. 1, 10, 267 P. 770 (1928).

In other words, article IV, section 24 concerns rules relating to the procedural requirements that must be followed once a lawsuit has been commenced.  Indeed, this constitutional provision authorizes superior courts to promulgate "customary rules having to do with the *minutiæ* of court government." State ex rel. Foster-Wyman Lumber Co., 148 Wash. at 10.  It does *not* constitute "a grant of power to make broad and general rules."  State ex rel. Foster-Wyman Lumber Co., 148 Wash. at 10.  As such, nothing in article IV, section 24 authorizes the promulgation of a rule that would impose a duty on the public in general and that does not relate to the governance of superior court procedure.

Nor could any court rule promulgated by our Supreme Court impose a duty on a nonlitigant before a lawsuit commences.  Indeed, our Supreme Court's authority to establish rules, which is codified in RCW 2.04.190, provides:

> The supreme court shall have the power . . . generally to regulate and prescribe by rule the forms for and the kind and character of the entire *pleading, practice and procedure* to be used in all suits, actions, appeals and proceedings of whatever nature by the supreme court, superior courts, and district courts of the state.  In prescribing such rules the supreme court shall have regard to the simplification of the system of pleading, practice and procedure in said courts to promote the speedy determination of litigation on the merits.

(Emphasis added.)

23

No. 82245-4-I/24

The court has defined the meaning of the terms "practice" and "procedure"

as used in this statute as follows:

> [W]hat constitutes practice and procedure, in the law, is the mode
> of proceeding by which a legal right is enforced,
>       ". . . that which regulates the formal steps in an action or
> other judicial proceeding; the course of procedure in courts; the
> form, manner and order in which proceedings have been, and are
> accustomed to be had; the form, manner and order of carrying on
> and conducting suits or prosecutions in the courts through their
> various states according to the principles of law and the rules laid
> down by the respective courts."  31 Cyc. Law & Procedure, p. 1153;
> id., 32, § 405; Rapalje & Lawrence's Law Dictionary; Anderson's
> Law Dictionary; Bouvier's Law Dictionary.

State v. Pavelich, 153 Wash. 379, 381, 279 P. 1102 (1929).

The court has also adopted the following definition of the term "process"

as it is used in RCW 2.04.190: "'In a larger sense, "process" is equivalent to

procedure, and may include all steps and proceedings in a cause *from its*

*commencement to its conclusion.*'"  State v. Fields, 85 Wn.2d 126, 129-30, 530

P.2d 284 (1975) (emphasis added) (quoting Mobley v. Jackson, 40 Ga. App. 761,

766, 151 S.E. 522 (1930)).  Because any rule promulgated under RCW 2.04.190

must relate to procedural matters once an action has been commenced, no court

rule adopted pursuant to this authority could impose a duty on nonlitigants before

a lawsuit commences.[18]

By contrast, the legislature is vested with the authority to create such

duties.  Indeed, "[t]he power of the legislature to enact laws is unrestrained,

---

[18] Superior courts also have the authority to adopt local rules under CR 83.  This rule provides: "Each court by action of a majority of the judges may from time to time make and amend local rules *governing its practice* not inconsistent with these rules."  CR 83(a) (emphasis added).  This rule was adopted by our Supreme Court pursuant to RCW 2.04.190.  Adoption of Civil Rules for Superior Court, 71 Wn.2d at xvii, cxlii (1967).  Plainly, CR 83 does not authorize superior courts to promulgate rules imposing duties on the general public.

24

No. 82245-4-I/25

unless, expressly or by fair inference, it is prohibited by the state or Federal constitution." Burns v. Alderson, 51 Wn.2d 810, 818, 322 P.2d 359 (1958). Pursuant to this power, "the legislature may impose legal duties on persons or other entities by proscribing or mandating certain conduct." Washburn v. City of Federal Way, 178 Wn.2d 732, 755, 310 P.3d 1275 (2013). Indeed, "[p]ublic policy is generally determined by the Legislature and established through statutory provisions." Cary v. Allstate Ins. Co., 130 Wn.2d 335, 340, 922 P.2d 1335 (1996). As such, "a court may not sua sponte manufacture public policy but rather must rely on that public policy previously manifested in the constitution, a statute, or a prior court decision." Roberts v. Dudley, 140 Wn.2d 58, 65, 993 P.2d 901 (2000).

Had a statute existed that required Carroll to retain tissue samples before this lawsuit commenced, she would have been required to do so. However, no such statute exists. Furthermore, because courts cannot impose rule-based duties on nonlitigants before a lawsuit commences, the superior court erred by ruling that "the spirit of the discovery rules" required Carroll to retain tissue samples before she filed her complaint. For this same reason, Nissan's attempt to validate the trial court's ruling by reference to section 6.3 of both the 2011 and 2018 King County Superior Court style orders is equally unavailing.[19] Carroll had

---

[19] In any event, by their plain terms, both the 2011 and 2018 style orders apply only to litigants and their attorneys. Indeed, section 6.3 of the 2011 style order provides, in pertinent part:

> *Plaintiff's counsel* shall attempt to obtain authorizations for autopsies from each *plaintiff*, and autopsies should be conducted for each *plaintiff* who expires for any reason *during the pendency of this litigation*, subject to religious or ethical considerations personal to that *plaintiff* or the immediate family. *Defendants* may provide a defense pathologist at their cost to observe the autopsy, who may request additional tissues be taken but shall not otherwise participate in the

25

No. 82245-4-I/26

no duty—rule-based or otherwise—to preserve any tissue samples before the litigation commenced.

The trial court also erred by finding that Carroll engaged in a sanctionable discovery violation by not responding to Nissan's December 21, 2018 request to preserve any remaining tissue samples. Leeper sent this letter by e-mail to the same e-mail address that Owens, on October 25, 2018, had informed Leeper that he "no longer use[s] or monitor[s]." Because Leeper sent her letter by e-mail to an e-mail address that she knew Owens did not monitor, Nissan did not establish that Owens willfully failed to respond.

But most importantly, whether Owens should have responded changed nothing and had no impact on Nissan's ability to prepare a defense. Again, there is no indication in the record that any tissue samples existed when the litigation

---

performance of the autopsy. The *defense* pathologist shall be provided with access to tissue samples, slides, and other matters reasonably necessary to make his/her own diagnosis. Tissue slides and other factual data obtained by the autopsy physicians and/or pathologists shall be made available one to the other. All reports and information furnished by the autopsy physician and/or pathologist shall be distributed to all *counsel*.

(Emphasis added.)

Additionally, section 6.3 of the 2018 style order provides, in pertinent part:

Should *plaintiff* decide to have an autopsy upon death, *plaintiff's counsel* shall notify defendants within five *court days* from the date *plaintiff* made that decision. *Plaintiff* shall pay half of the cost for that autopsy and *defendants* shall bear the other half of the cost. Any *defendant* may provide a *defense* pathologist at their cost to observe the autopsy and/or may request additional tissues be taken but shall not otherwise participate in the performance of the autopsy. The *defense* pathologist shall be provided with access to tissue samples, slides, and other matters reasonable [sic] necessary to make his/her own diagnosis and/or causation opinions. Tissue, tissue slides and blocks together with any other factual data obtained by the autopsy physicians and/or pathologists shall be made available to any party. All reports and information furnished by the autopsy physician and/or pathologist shall be distributed to all *counsel*.

(Emphasis added.)

By using terms and phrases such as "plaintiff's counsel," "plaintiff," "during the pendency of this litigation," "defendants," "counsel," "court days," and "defense," these orders plainly apply only to those in active litigation and only when an autopsy takes place during the period of litigation.

26

commenced and thus no indication that anything of value was withheld. Although the autopsy authorization form stated that "histology blocks shall be retained indefinitely," there is no indication in the record as to what, exactly, histology blocks are and whether such material would have been useful to Nissan. Thus, even if Nissan could have discovered the histology blocks before RPAS ceased operations on April 15, 2019, there is no support in the record that Nissan was prejudiced by its inability to retrieve any remaining histology blocks. Moreover, as already explained, the trial court found that, six months after the autopsy was performed, RPAS "gave *all* remaining unclaimed tissue and fluid to medical research." Finding of Fact 6 (emphasis added). Because this finding is unchallenged on appeal, we must assume that any tissue samples that might have been useful to Nissan were donated to medical research long before the litigation commenced. See Pierce, 15 Wn. App. 2d at 429.

Nevertheless, Nissan avers that "[t]he Estate and its counsel's failure to notify Nissan of their intent to conduct an autopsy substantially prejudiced Nissan's ability to prepare for trial."[20] According to Nissan, "[h]ad [it] received notice and participated in the autopsy, it would have been able to independently examine and assess this highly probative evidence of what caused [the] alleged mesothelioma."[21] Yet the trial court expressly concluded that Carroll did *not* have a duty to inform Nissan of the autopsy when the autopsy occurred: "[I]t is certainly within the spirit of the discovery rules that when an autopsy occurs, opposing counsel is told (*if there is opposing counsel at the time, which in this*

---

[20] Br. of Resp't at 45.
[21] Br. of Resp't at 45.

27

No. 82245-4-I/28

*case there was not*)." Finding of Fact 23 (emphasis added). This ruling was correct. Indeed, as already explained, any notice requirements contained within the superior court's style orders did not apply to Carroll before the litigation commenced. Therefore, Carroll did not have a duty to inform Nissan of the autopsy before the autopsy occurred.[22]

Undeterred, Nissan asserts that the trial court's conclusion that Carroll had a duty to preserve the tissue samples is supported by the record because the loss of any remaining tissue samples amounted to spoliation.[23] However, the trial court did not find that Carroll engaged in spoliation. This is understandable given that there is no evidence in the record indicating that Carroll engaged in spoliation.

Spoliation is "'[t]he intentional destruction of evidence.'" Henderson v. Tyrrell, 80 Wn. App. 592, 605, 910 P.2d 522 (1996) (alteration in original) (quoting BLACK'S LAW DICTIONARY 1401 (6th ed. 1990)). In determining whether a party engaged in spoliation, "many courts examine whether the party acted in bad faith or conscious disregard of the importance of the evidence, or whether there was some innocent explanation for the destruction." Henderson, 80 Wn.

---

[22] In any event, it is unclear how, exactly, Carroll could have notified anyone at Nissan of the autopsy prior to it taking place. Indeed, Nissan's behavior in this case is hardly a model of informal approachability. To the contrary, Nissan insisted on being served summons in accordance with the dictates of the Hague Convention. As a result, Nissan was not served and was not subject to the court's personal jurisdiction until *six months* after Carroll filed her complaint. It is not clear how Carroll could have gone about notifying anyone at Nissan of the autopsy that occurred two years prior to litigation commencing and *three days* after Lawrence's death. Most problematic is that Nissan never suggests just *who* Carroll should have notified at Nissan about the impending autopsy.

[23] Nissan's merits brief asserts: "The Estate's conduct of the secret autopsy and subsequent destruction of the evidence demonstrates a conscious intent to frustrate legitimate inquiry by the defendants on this vital topic. Such classic spoliation was properly punished by the trial court." Br. of Resp't at 38.

28

App. at 609. Bad faith exists when there is "destruction that is both willful and with an improper motive." 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 402.5, at 280 (6th ed. 2016). As such, "a party's negligent failure to preserve evidence relevant to foreseeable litigation is not sanctionable spoliation." Cook v. Tabert Logging, Inc., 190 Wn. App. 448, 464, 360 P.3d 855 (2015). However, "[n]o bad faith, and thus, no spoliation, will be found if the party had no duty to preserve the evidence in the first place." 5 TEGLAND, supra, at 280. Furthermore, in determining whether a party acted in bad faith by destroying evidence before a lawsuit commences, courts should consider whether a request to preserve the evidence had been made before the evidence was destroyed. Cook, 190 Wn. App. at 464; Tavai v. Walmart Stores, Inc., 176 Wn. App. 122, 136, 307 P.3d 811 (2013); Ripley v. Lanzer, 152 Wn. App. 296, 326, 215 P.3d 1020 (2009).

Carroll did not have a duty to preserve any remaining tissue samples before this litigation commenced. To reiterate, the trial court found that, pursuant to RPAS's own retention policy, "*all* remaining unclaimed tissue and fluid" were donated "to medical research" six months after the autopsy was performed on April 21, 2016. Finding of Fact 6 (emphasis added). Because the remaining tissue samples were disposed of pursuant to RPAS's own retention policy before the litigation commenced, Carroll did not have a duty to preserve any tissue samples. See Cook, 190 Wn. App. at 464; Tavai, 176 Wn. App. at 136; Ripley, 152 Wn. App. at 326; Henderson, 80 Wn. App. at 609. Indeed, even if Carroll was viewed—for some unstated reason—as being negligent by not preserving

29

any remaining tissue samples, such a negligent failure to preserve evidence does not constitute spoliation. See Cook, 190 Wn. App. at 464. Therefore, Nissan's appellate resort to a spoliation claim does not serve to validate the trial court's dismissal order.

But even if our just-stated conclusion was different, the remedy imposed for an act of spoliation would generally be far less severe than the remedy imposed by the trial court herein:

> If a party to a civil case has destroyed relevant evidence in bad faith, *the fact of destruction is normally admissible* on the theory that the destruction suggests consciousness of potential liability or consciousness of other adverse consequences if the evidence were to be presented to a trier of fact. In other words, it reveals the party's own belief that he or she has a weak case.

5 TEGLAND, supra, at 280 (emphasis added).

Indeed, at the turn of the 20th century, our Supreme Court explained:

> It is a rule of evidence, as old as the law itself, applicable alike to both civil and criminal causes, that a party's fraud in the preparation or presentation of his case, such as the suppression or attempt to suppress evidence by the bribery of witnesses or the spoliation of documents, *can be shown against him as a circumstance tending to prove that his cause lacks honesty and truth*.

State v. Constantine, 48 Wash. 218, 221, 93 P. 317 (1908) (emphasis added).

Approximately 70 years later, the court reiterated:

> We have previously held on several occasions that where relevant evidence which would properly be a part of a case is within the control of a party whose interests it would naturally be to produce it and he fails to do so, without satisfactory explanation, the *only* inference which the finder of fact may draw is that such evidence would be unfavorable to him. In so holding, we have noted, "'[t]his rule is uniformly applied by the courts and is an integral part of our jurisprudence.'" British Columbia Breweries (1918) Ltd. v. King County, 17 Wn.2d 437, 455, 135 P.2d 870 (1943) (quoting with approval 20 Am. Jur. § 183, at 188). See Bengston v. Shain, 42

30

Wn.2d 404, 255 P.2d 892 (1953); Krieger v. McLaughlin, 50 Wn.2d 461, 313 P.2d 361 (1957).

Pier 67, Inc. v. King County, 89 Wn.2d 379, 385-86, 573 P.2d 2 (1977) (emphasis added).

Put differently, "[a]lthough the fact of destruction is admissible to create a negative inference, the traditional rule is that the negative inference that follows . . . will not supply a missing link in the adversary's case; i.e., *it will not establish an essential fact not otherwise proved*." 5 TEGLAND, supra, at 282 (emphasis added) (footnote omitted). Such remedies fall far short of completely dismissing all of a plaintiff's causes of action.

Despite the fact that Carroll did not engage in spoliation, the trial court, without explanation, rejected her proposal for the imposition of a lesser sanction in lieu of outright dismissal: an adverse inference jury instruction that would have *allowed* the jury to infer an essential fact that was not otherwise proved. Specifically, approximately two months before the trial court entered its final order granting Nissan's motion to strike the complaint, Carroll suggested that—in lieu of dismissal—the trial court "impose the lesser sanction of a jury instruction that, had tissue from the 2016 autopsy been retained, *it would likely have shown the presence of amphibole asbestos fibers*." (Emphasis added.) This instruction would have provided a more than sufficient remedy for the lack of any tissue samples being retained. See Magaña, 167 Wn.2d at 590 ("The discovery sanction should be proportional to the discovery violation and the circumstances of the case."); Burnet, 131 Wn.2d at 495-96 ("[T]he court should impose the least severe sanction that will be adequate to serve the purpose of the particular

31

sanction."). The trial court's failure to properly consider this proposal for an adverse inference jury instruction was contrary to Burnet and its case law progeny and constituted an abuse of discretion.

To be clear, we do not hold that dismissal of a lawsuit or the entry of a default judgment is *never* warranted when a party engages in spoliation. Indeed, in J.K. by Wolf v. Bellevue Sch. Dist. No. 405, we affirmed a trial court's entry of a default judgment on liability against a defendant who both engaged in spoliation and provided untimely and incomplete responses to interrogatories which requested information concerning the destroyed evidence. 20 Wn. App. 2d 291, 295-96, 313-14, 500 P.3d 138 (2021). However, in that case, the defendant had a statutory duty to preserve the evidence in question. J.K., 20 Wn. App. 2d at 309. Additionally, the defendant failed to preserve this evidence despite having received requests to do so—before the evidence was destroyed— from both the plaintiff and the defendant's own counsel. J.K., 20 Wn. App. 2d at 309-10. Finally, the trial court in that case *considered* an adverse inference instruction that was proposed by the defendant, but concluded that the instruction "would not provide a sufficient punishment for, and deterrence against, evidence destruction and would distract the jury from the merits of [the plaintiff]'s claims by having it focus on whether [the defendant] successfully overcame the presumption." J.K., 20 Wn. App. 2d at 322.

None of the same factors are present here. As already explained, Carroll did not have a duty to retain tissue samples from an autopsy that occurred years before this litigation commenced. Additionally, although Leeper sent Owens a

32

letter requesting the preservation of any remaining tissue samples, Leeper sent

this letter to an e-mail address that she knew he did not monitor. In any event,

there is no evidence in the record that, when Leeper sent this request to Owens,

any tissue samples existed that would have assisted Nissan in preparing for trial.

Finally, unlike the trial court in J.K., the trial court herein did *not* consider a

proposed adverse inference instruction. For these reasons, J.K. does not

support the trial court's decision to dismiss all of Carroll's claims.

For the reasons set forth above, Carroll did not have a duty to retain tissue

samples from the autopsy that occurred two years before this litigation

commenced. Accordingly, the trial court abused its discretion by imposing such

a duty on Carroll. This conduct did not amount to a discovery violation and was

improperly analyzed by the trial court.

B

Carroll next asserts that the trial court erred by ruling that she engaged in

a discovery violation by failing to provide Nissan with Social Security

authorizations within 90 days after she filed her complaint. We agree.

Nissan was served with a summons in a manner required by the Hague

Convention. As a result, Nissan was not served until October 9, 2018, which was

six months after Carroll filed her complaint on April 10, 2018. On May 31, 2019,

according to the declaration of Leeper, "Plaintiff's counsel produced the social

security records of Lawrence Carroll he had in his possession." Then, on

33

August 1, 2019, Karst's paralegal provided Leeper with updated authorizations.

The trial court found that "Plaintiff took a year to produce Lawrence Carroll's social security records in discovery. Plaintiff was required under the Revised Consolidated Pretrial Style Order to produce a current authorization to obtain social security records 90 days after the lawsuit was filed." Finding of Fact 27. We disagree. Because Nissan had not yet become subject to the personal jurisdiction of the court within 90 days after the lawsuit was filed, this finding is erroneous.

The style order relied on by the trial court provided that "Plaintiff's counsel shall execute a stipulation for the release of employment related records . . . and deliver it to counsel for all parties within 90 days of filing the Complaint." Because Nissan insisted on being served in accordance with the dictates of the Hague Convention, it was not served until six months after Carroll filed her complaint. Before Nissan was served, Nissan was not subject to the personal jurisdiction of the superior court. Nissan, which had not yet accepted the court's authority over itself, was not entitled to any benefit then applicable to those entities that had done so. Simply put, Nissan was not a proper party to the lawsuit before it was served. Had Nissan desired to benefit from the provisions of the style orders and related court rules, it could have accepted service and thereby subjected itself to the court's jurisdiction. It did the opposite. As Nissan was not subject to the court's control, neither was it entitled to benefit from the court's control over others. The trial court erred by ruling otherwise.[24]

_____

[24] Furthermore, Nissan was not prejudiced by receiving authorizations on August 1, 2019, which was 15 months before trial was ultimately set to commence on November 9, 2020.

34

No. 82245-4-I/35

C

Carroll next contends that she did not engage in a discovery violation in response to style interrogatory 13. We agree.

Style interrogatory 13 provided:

*If you contend* decedent was exposed to asbestos or asbestos products under circumstances outside of decedent's employment, please state the following:

(a)     The physical location, place and circumstances of this exposure;

(b)     The trade name, manufacturer, product type, and product contents to which decedent was exposed;

(c)     The dates you contend decedent came into contact with each such product; and

(d)     The names and addresses of all persons who have knowledge or witnessed this exposure.

(Emphasis added.)

Carroll submitted the following response to style interrogatory 13: "Decedent was exposed to asbestos during the 1970s and 1980s while working occasionally as a shade-tree mechanic, using the same products identified in the Answer to Interrogatory No. 12."

The trial court found that "interrogatory 13 was not limited to claimed exposures in this case; it asked about all exposures to asbestos." Finding of Fact 24. Hence, the trial court found that style interrogatory 13 required Carroll to provide details regarding the claims that she filed in bankruptcy trust proceedings. Findings of Fact 13 and 25.

A party responding to an interrogatory "should exercise reason and common sense to attribute ordinary definitions to terms and phrases utilized in

---

Because Nissan was provided these authorizations long before trial was set to commence, its ability to prepare for trial was not shown to have been prejudiced. See Burnet, 131 Wn.2d at 496.

35

No. 82245-4-I/36

interrogatories." <u>Pulsecard, Inc. v. Discover Card Servs., Inc.</u>, 168 F.R.D. 295,

310 (D. Kan. 1996).  Style interrogatory 13 can be found on King County's

website.[25]  A reasonable interpretation of this style interrogatory is that it is meant

to apply only when a plaintiff sues a defendant who is not a former employer,

which was not the case here.  Indeed, interrogatory 13 was prefaced with the

sentence: "*If you contend* decedent was exposed to asbestos or asbestos

products under circumstances outside of decedent's employment."  (Emphasis

added.)  In the proceeding herein, Carroll did not so contend.  Instead, Carroll

contended that her husband was exposed to asbestos when he worked for

Nissan.  The interrogatory at issue was not worded to require the answer the trial

court found to be necessary.

Because this style interrogatory reasonably appears to be intended to

apply only to cases in which a plaintiff sues a defendant who is not a former

employer, and because Carroll was not advancing the contention referenced

therein, the trial court erred by finding that Carroll engaged in a discovery

violation by way of her answer to the interrogatory.  Moreover, the trial court

erred by concluding that—by giving a truthful answer to the plain meaning of the

interrogatory—Carroll *willfully* sought to answer untruthfully.[26]

---

[25] In particular, this style interrogatory can be found at the following hyperlink, wherein the interrogatory is also listed as interrogatory 13 and utilizes the exact same formatting and font as the interrogatory used in this case: https://kingcounty.gov/~/media/courts/superior-court/docs/civil/asbestos-forms/defense-interrogatories-to-deceased-plaintiff-pdf.ashx?la=en [https://perma.cc/7ZDP-RNZR].

[26] Additionally, any delay in providing Nissan with information regarding the bankruptcy trust claims did not prejudice Nissan because Carroll disclosed this information to Nissan well before trial.  In particular, Carroll provided Nissan with certain releases relating to the bankruptcy trust claims on June 3, 2019, and all remaining documents related to these claims on July 12,

No. 82245-4-I/37

D

We next address the trial court's analysis of the propriety of Carroll's behavior concerning the bankruptcy trust claims. With regard to these claims, the trial court found:

> The statements in [the bankruptcy trust] claims *conflict* with the allegation in the instant Complaint that Lawrence Carroll's mesothelioma resulted from occupational exposures while working as a Parts Manager at Datsun and Nissan automobile dealerships.

Finding of Fact 12 (emphasis added).

Similarly, the trial court found: "In response to the interrogatory, Plaintiff should have disclosed the statements made in the Bankruptcy Court Trust claim forms – *materially inconsistent* with the allegations of the instant Complaint – but did not." Finding of Fact 25 (emphasis added).

In fact, Carroll's bankruptcy trust claims were not materially inconsistent with her claims filed herein. It is well established that "[t]here may, of course, be more than one proximate cause of an injury, and the concurring negligence of a third party does not necessarily break the causal chain from original negligence to final injury." Smith v. Acme Paving Co., 16 Wn. App. 389, 396, 558 P.2d 811 (1976). As such, Carroll's allegation that Lawrence's mesothelioma was proximately caused during the time that he worked for Nissan was not inconsistent with her claims filed in the bankruptcy trust proceedings.[27]

---

2019. By the time Carroll provided all remaining bankruptcy trust documents to Nissan, trial was ultimately set to commence 16 months later on November 9, 2020. Because a significant amount of time remained before trial, any delay in providing Nissan with the documents related to the bankruptcy trust claims was not shown to have prejudiced Nissan. See Burnet, 131 Wn.2d at 496.

[27] We note, however, that pursuant to RCW 4.22.070(1), the acts of an entity that is not a party to the lawsuit may limit the amount of the defendant's liability.

No. 82245-4-I/38

Nevertheless, Nissan asserts that, in light of the bankruptcy trust claims, Carroll was judicially estopped from filing her lawsuit against Nissan. Not so. For judicial estoppel to apply, a party's position must be inconsistent with an earlier position that the party has taken. Arikson v. Ethan Allen, Inc., 160 Wn.2d 535, 538-39, 160 P.3d 13 (2007). Because Carroll's claims against Nissan were not entirely inconsistent with her position in the bankruptcy proceedings, judicial estoppel does not apply.[28] Accordingly, the trial court erred by ruling that Carroll's claims against Nissan both conflicted with and were materially inconsistent with the claims filed in the bankruptcy proceedings.

E

Carroll additionally contends that the trial court erred by finding that she engaged in a discovery violation in response to style interrogatory 16. Because Carroll properly responded to this interrogatory, we agree.

Style interrogatory 16 stated:

Provide the following with respect to the asbestos-related disease which forms the basis of this lawsuit. (Do not refer defendants to your medical records. Provide specific answers.):
(a)     Nature of asbestos-related disease;
(b)     Date disease was diagnosed;
(c)     Physician or health care facility diagnosing the asbestos-related condition; and
(d)     Physicians or health care facilities which have provided care or treatment for the asbestos-related condition since diagnosis.

In response to style interrogatory 16, Carroll stated:

(a)     Mesothelioma
(b)     10/19/2015
(c)     Lennart C Tran, M.D.—Overlake Medical Center

---

[28] Indeed, absent the bankruptcy filings, all of Carroll's theories of liability could have been presented in a single lawsuit. It was the bankruptcy filings that precluded this.

38

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

(d)     Please see Decedent's Physician & Hospital List attached

The trial court found that style interrogatory 16 required Carroll to disclose "the autopsy pathologist who made a diagnosis." Finding of Fact 15. However, style interrogatory 16 is reasonably read to require only disclosure of any physicians who diagnosed and treated an asbestos-related condition while Lawrence was alive. Indeed, a notable dictionary defines "physician," in relevant part, as "a person skilled in the art of *healing* : one duly authorized to *treat* disease." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1707 (2002) (emphasis added). Additionally, "health care" is defined as "[t]he *prevention, treatment, and management* of illness and the *preservation* of mental and physical well-being through the services offered by the medical and allied health professionals." AMERICAN HERITAGE DICTIONARY 833 (3d ed. 1992) (emphasis added). To the contrary, the term "autopsy" is defined as "to perform a *postmortem* examination upon." WEBSTER'S, supra, at 149 (emphasis added). It goes without saying that Lawrence was no longer alive when the autopsy was performed. Therefore, style interrogatory 16 did not explicitly require Carroll to disclose information regarding the pathologist who performed the autopsy.

Accordingly, the trial court erred by concluding that, pursuant to style interrogatory 16, Carroll was required to disclose information regarding the autopsy pathologist who performed the autopsy on her husband's body. In addition, the trial court erred by concluding that—by providing truthful information that was responsive to a reasonable reading of the interrogatory—Carroll willfully violated a discovery obligation.

No. 82245-4-I/40

F

We next address Carroll's response to style interrogatory 20, which required disclosure of Lawrence's death certificate. Because Carroll properly responded to this interrogatory, the trial court erred by ruling that Carroll engaged in a discovery violation by providing a true copy of the death certificate to Nissan.

Style interrogatory 20 stated: "If a death certificate was prepared after the death of decedent, please attaché [sic] a copy of the death certificate." In response, Carroll provided a true copy of her husband's death certificate. This death certificate erroneously stated, in one location, "Autopsy: No." The trial court found that Interrogatory 20 "required disclosure of . . . a Death Certificate that did not contain false information that there was 'no autopsy.'" Finding of Fact 15. However, style interrogatory 20 required no such thing. Instead, this interrogatory requested a true copy of Lawrence's death certificate. Carroll provided exactly that when she produced a true copy of the death certificate. Carroll was in no way obligated to alter a public document in order to answer the interrogatory.[29]

Accordingly, the trial court erred by finding that Carroll engaged in a discovery violation in responding to style interrogatory 20.

G

We next address the trial court's finding that "Plaintiff's delays in . . . providing witnesses for depositions substantially prejudiced Defendants' ability to prepare for trial." Finding of Fact 33. The trial court erred by finding that any

---

[29] Again, the trial court erred by ruling that Nissan had proved that Carroll acted willfully in a wrongful way by providing a true copy of the exact public document requested.

40

delay in providing witnesses for deposition amounted to a discovery violation. In its motion to strike the complaint, Nissan asserted that Carroll's attorneys delayed making both Carroll and an expert witness, Dr. David Zhang, available for depositions. However, Nissan did not assert that this delay violated any court order or court rule. See Magaña, 167 Wn.2d at 584. Because Nissan did not establish that this conduct amounted to a discovery violation, the trial court improperly considered this conduct in dismissing Carroll's complaint.[30]

IV

Having analyzed the conduct that the trial court improperly found to amount to discovery violations, we next analyze conduct that did not amount to a willful violation. In particular, we address the trial court's finding that Carroll and her son, Douglas, engaged in a discovery violation by providing "evasive responses at depositions regarding an autopsy." Finding of Fact 33. According to the trial court, "[i]t is not credible that the deceased's son or the widow who arranged for the autopsy with Karst would not know that an autopsy had been performed on their father and husband." Finding of Fact 16. Because Nissan does not establish that Carroll and Douglas *willfully* provided evasive deposition

---

[30] In any event, Nissan was not prejudiced by any delay in deposing witnesses. Nissan first requested a deposition of Carroll in June 2019. She was ultimately deposed on December 19, 2019. Dr. Zhang was deposed on March 16, 2020. Because the court reporter contracted COVID-19, a transcript of Dr. Zhang's deposition was never produced. According to her declaration, Leeper "called George Kim, Plaintiff's counsel, asking to re-depose [Dr. Zhang] and he refused to offer Dr. Zhang for a re-deposition without a court order."

The trial court erred by finding that Nissan proved that it was prejudiced by the delay in deposing Carroll because Nissan deposed her in December 2019, which was 11 months before trial was ultimately set to commence in November 2020. See Burnet, 131 Wn.2d at 496. Additionally, any prejudice resulting from attorney Kim's refusal to offer Dr. Zhang for a second deposition could have been cured by Nissan seeking a court order in the eight months that remained between Dr. Zhang's deposition on March 16, 2020, and the date that trial was ultimately set to commence.

responses, the trial court erred by relying on this conduct as a basis for striking Carroll's complaint.

When determining whether a trial court abused its discretion by imposing a severe discovery sanction, we do not merely evaluate whether the trial court's factual findings are supported by the evidence. We must also determine whether the evidence supporting these findings justifies the sanction imposed.[31] Indeed, when a trial court imposes a discovery sanction, the sanction imposed "should be proportional to the discovery violation and the circumstances of the case." Magaña, 167 Wn.2d at 590. Furthermore, to warrant the imposition of a severe discovery sanction, the record must "clearly show" that "one party willfully or deliberately violated the discovery rules and orders." Magaña, 167 Wn.2d at 584. Indeed, when imposing severe sanctions under CR 37(b),

> [t]he trial court's discretion is not without limits. The rule specifically provides that the order must be "just." CR 37(b)(2). Due process considerations also require that before a trial court dismisses an action or counterclaim, or renders a judgment by default, there must have been "a willful or deliberate refusal to obey a discovery order, which refusal substantially prejudices the opponent's ability to prepare for trial." Associated Mortgage Investors v. G.P. Kent Constr. Co., 15 Wn. App. 223, 228-29, 548 P.2d 558, review denied, 87 Wn.2d 1006 (1976).

Snedigar v. Hodderson, 53 Wn. App. 476, 487, 768 P.2d 1 (1989), rev'd in part on other grounds, 114 Wn.2d 153, 786 P.2d 781 (1990).

To this end, our Supreme Court has explained that "'[f]air and reasoned resistance to discovery is not sanctionable.'" Magaña, 167 Wn.2d at 584

---

[31] A finding of a willful violation is required to grant the trial court discretion to consider the imposition of a most severe sanction. However, the evidence supporting that finding is necessarily considered in determining whether the discretion bestowed was properly exercised. Here, the evidence in support was scant and hardly clear.

No. 82245-4-I/43

(quoting Fisons, 122 Wn.2d at 346). Furthermore, a party's mere failure to comply with a discovery obligation does not establish a willful violation:

> This court has held that a party's failure to comply with a court order will be deemed willful if it occurs without reasonable justification. Magaña v. Hyundai Motor Am., 167 Wn.2d 570, 584, 220 P.3d 191 (2009) (citing Rivers v. Wash. State Conf. of Mason Contractors, 145 Wn.2d 674, 686-87 & n.54, 41 P.3d 1175 (2002)). It has more recently noted, however, that Burnet's willfulness prong would serve no purpose "if willfulness follows necessarily from the violation of a discovery order." Blair[ v. Ta-Seattle East No. 176], 171 Wn.2d [342, ]350 n.3[, 254 P.3d 797 (2011)]. Something more is needed.

Jones v. City of Seattle, 179 Wn.2d 322, 345, 314 P.3d 380 (2013).

As such, we have explained that "Jones disavowed the usual presumption that violating a rule constitutes a willful act, holding instead that willfulness must be demonstrated." Farrow v. Alfa Laval, Inc., 179 Wn. App. 652, 664 n.8, 319 P.3d 861 (2014) (citing Jones, 179 Wn.2d at 345).

Thus, in order to evaluate whether Carroll and Douglas provided willfully evasive responses to deposition questions, we must examine the record to determine whether any uncertainty expressed in their answers was justified or whether the record demonstrates that Carroll and Douglas engaged in a deliberate attempt to not answer any questions truthfully.[32] Here, the record is devoid of any evidence that either Carroll or Douglas knew—at the time of their depositions—that an autopsy had been performed. Although Carroll signed a form authorizing RPAS to conduct an autopsy, this evidence, at most, indicates

---

[32] In response to Nissan's motion to strike the complaint, Carroll's attorneys argued that "[b]oth Mrs. Carroll and Doug Carroll testified at their depositions that they thought an autopsy had been done, but were unsure; there is no basis for Nissan Defendants' contention that this was evasive, much less intentionally so."

43

that Carroll knew that an autopsy was *authorized* to be performed. It does not

indicate that Carroll knew that an autopsy was, in fact, performed. Moreover, at

the time of her deposition, Carroll was over 80 years old and testifying over three

and a half years after her husband had passed away. Carroll also signed the

autopsy authorization form the *same day* that her husband died. As such, there

is no support in the record that, when Carroll was deposed, she knew that an

autopsy had, in fact, been performed. Additionally, the record does not contain

*any* evidence indicating that Douglas knew that an autopsy had been performed.

With this context in mind, we determine whether Carroll and Douglas provided

deliberately evasive responses to deposition questions.

On March 26, 2019, Nissan deposed Douglas, who testified as follows:

> Q.     Okay. And when [your father] passed, is there a
> reason, then, why an autopsy was not performed?
> A.     **I thought there was. I -- I don't know.**
> Q.     Other than anything told to you by an attorney or from
> Mr. Karst or his firm, did anyone else tell you not to have an
> autopsy performed?
> A.     I wasn't involved.
> Q.     Who made that decision, do you know, regarding not
> having an autopsy?
> A.     I'm not -- my mom. I don't -- I don't know.

(Emphasis added.)

These responses were not willfully evasive. Indeed, before expressing

uncertainty, Douglas testified that he thought that an autopsy had been

performed. Despite this response, Nissan's attorney did not ask Douglas to

clarify his answer. Instead, Nissan continued to ask two more questions

presuming that an autopsy had not been performed. These questions appear

designed to be confusing and to make Douglas express uncertainty as to

whether an autopsy had been performed. Accordingly, Nissan failed to establish that Douglas provided willfully evasive responses during his deposition. The answers were literally true and plainly set forth Douglas's knowledge of the situation.

Next, on December 19, 2019, Nissan deposed Carroll, who testified as follows:

> Q. I understand that when your husband passed away there was no autopsy that was done. Is that correct?
> A. **Yes, they did.**
> Q. They did an autopsy?
> A. I don't know. **I thought they did.** Maybe they didn't. I don't know.
> Q. Okay. But you know that you did not tell anybody "do not do an autopsy"?
> A. No, I didn't tell anybody that.

(Emphasis added.)

The evidence in support of the trial court's finding is scant. Indeed, when Nissan's attorney asked whether it was correct that no autopsy had been performed, Carroll stated that an autopsy had, in fact, been performed. This was true. When Nissan's attorney pressed again as to whether an autopsy had been performed, Carroll expressed uncertainty but stated that she "thought they did." This response was both literally true and accurately set forth her knowledge of the situation.

But even were we to conclude that Nissan established that Carroll and Douglas provided evasive responses to deposition questions, our view of the adequacy of this evidence, considered in the totality, to support the imposition of a most severe sanction would be the same. It was not. We say this because

No. 82245-4-I/46

Nissan did not establish that it was substantially prejudiced in its ability to prepare for trial as a result of these responses. Indeed, in section V of this opinion, we explain that Nissan was not substantially prejudiced by Carroll's failure to disclose the autopsy report in response to interrogatory 21, a substantially similar allegation of misconduct.

Additionally, the record indicates that Nissan failed to mitigate any prejudice resulting from the deposition testimony of Carroll and Douglas. Notably, when Nissan deposed Carroll and Douglas, Nissan did not inquire into whether any other members of Carroll's family may have dealt with matters regarding an autopsy. Yet such a simple inquiry might have proved beneficial to Nissan. Indeed, the record indicates that Carroll's daughter, Dana, both knew that an autopsy occurred and handled matters for the family related to the autopsy.[33] Although Leeper's declaration states that Nissan deposed Dana, a transcript of this deposition testimony is not contained within the record on appeal. Likewise, Nissan did not attach a transcript of this deposition testimony to its motion to strike Carroll's complaint. Thus, both the record on appeal and the record that was before the trial court are devoid of any indication as to whether Nissan asked Dana about the autopsy. Nissan does not explain why it did not include a copy of this transcript in the record.

---

[33] In particular, the record contains an e-mail message that Dana sent to Karst on July 19, 2016 wherein Dana provided Karst with a copy of the autopsy report. When Nissan deposed Carroll and Douglas, Nissan did not know about the existence of this e-mail message. Nevertheless, this e-mail message indicates that Dana both knew that the autopsy occurred and handled matters related to the autopsy.

46

When a trial court fashions a discovery sanction, "the sanction imposed should be proportional to the nature of the discovery violation *and the surrounding circumstances.*" <u>Rivers</u>, 145 Wn.2d at 695 (emphasis added). As such, the trial court should consider the other party's failure to mitigate. <u>Fisons Corp.</u>, 122 Wn.2d at 356. The trial court should have considered Nissan's failure to inquire into whether any other family members may have handled matters related to an autopsy.

Moreover, the trial court abused its discretion by not considering whether a lesser sanction, Carroll's proposed adverse inference instruction, would have cured any prejudice resulting from the deposition responses given by Carroll and Douglas. See <u>Burnet</u>, 131 Wn.2d at 494; <u>Teter</u>, 174 Wn.2d at 216-17.

For all of these reasons, the trial court improperly relied on these deposition responses as a basis for striking Carroll's complaint.

V

Finally, we address various conduct that the trial court properly found to amount to discovery violations. Because Nissan does not establish that it was substantially prejudiced in its ability to prepare for trial as a result of these violations, the trial court erred by relying on these violations as a basis for dismissing Carroll's claims.

A

We first address Carroll's response to style interrogatory 21, which required disclosure of the autopsy report. Carroll's response to this interrogatory amounted to a discovery violation. However, because Nissan was not

47

substantially prejudiced by Carroll's untruthful response to this interrogatory, the

trial court erred by relying on her response as a justification for dismissal.

Style interrogatory 21 stated:

If an autopsy was performed on decedent, please attach a copy of the autopsy report or state the following:
(a)    The person(s) performing such autopsy, including their employer, title, professional affiliations, etc.;
(b)    Date on which the autopsy was performed;
(c)    The place where the autopsy was performed; and
(d)    The basic results, findings, and conclusions of the autopsy report.

In response to style interrogatory 21, Carroll stated, "Not Applicable."

The trial court found that style interrogatory 21 required Carroll to disclose

the autopsy report and that Carroll "signed off" on a false response to this

interrogatory. Finding of Fact 15. The trial court also found that "[w]ithholding an

autopsy report . . . presumably could affect the outcome of the case." Finding of

Fact 34. Additionally, the trial court found:

As of the date of this hearing (October 16, 2020), Plaintiff still has not produced the autopsy report to defendants despite discovery requests, supplemental requests, and the depositions of experts who testified under the false impression that no autopsy had been performed.

Finding of Fact 7.

Proof that Carroll herself knew the correct answer to this interrogatory is

absent from the record. However, by signing off on the response to this

interrogatory, Carroll could reasonably be charged with any knowledge that

reasonable diligence on her part would have uncovered. See Fisons Corp., 122

Wn.2d at 343-44; CR 26(g); CR 33(a). In this way, her answer could be viewed

as a discovery violation. However, Nissan failed to demonstrate that Carroll's

No. 82245-4-I/49

response to this interrogatory substantially prejudiced its ability to prepare for trial.

Indeed, the trial court found that Nissan came into possession of "the autopsy report on their own in 2019." Finding of Fact 8. This report stated that Lawrence's cause of death was "MALIGNANT PLEURAL MESOTHELIOMA WITH METASTASIS." The report did not state which type of asbestos fibers caused the mesothelioma.

Nissan asserts that it obtained the autopsy report on July 13, 2020, and that the trial court mistakenly found that it obtained the report in 2019.[34] However, Nissan does not assign error to the trial court's finding that it obtained the report in 2019. As such, it is a verity on appeal. See Pierce, 15 Wn. App. 2d at 429. In any event, regardless of when Nissan obtained the autopsy report, the record indicates that this report was neither beneficial nor prejudicial to Nissan's case.

Notably, during the hearing on Nissan's motion to strike Carroll's complaint, Nissan's attorney stated that, because Nissan was not in possession of any remaining tissue samples, he did not know whether the autopsy report was prejudicial to its case:

> THE COURT: Okay. So does the autopsy report help you or hurt you if it were to come into trial?
> [NISSAN'S COUNSEL]: We don't know yet because what we need is we need the tissue that should have been preserved.

---

[34] Nissan's opening brief states: "On July 13, 2020, after many months of investigation, Nissan located and obtained the autopsy report." Br. of Resp't at 44. Additionally, in its reply brief on cross appeal, Nissan states: "Nissan did not obtain a copy of the autopsy report from Dr. Hartenstein until *July 13, 2020*." Reply Br. of Resp't at 11.

49

No. 82245-4-I/50

This answer makes clear that the autopsy report itself was "neutral" in its impact.

Because Nissan's counsel expressed that he did not know whether the autopsy report was either beneficial or prejudicial to Nissan, the trial court declined to strike the autopsy report:

> THE COURT: . . . I considered striking the autopsy report as a sanction, but I don't know that that's a sanction. [Nissan's attorney] hasn't decided yet whether it's a good thing or a bad thing for his case, so striking the autopsy report might have no effect on anything and wouldn't be a sanction of any kind. It would just be -- it could end up being a plus for the defendants -- or for the plaintiffs, so far as I know.

In weighing the importance of any destroyed or concealed evidence, a trial court should consider whether such "evidence gave the culpable party an investigative advantage."[35] Cook, 190 Wn. App. at 462. Nissan represented during the hearing on its motion to strike the complaint that the content of the autopsy report appeared to be, by itself, entirely neutral. Nissan's counsel further explained that, to determine the evidentiary value of the autopsy report, Nissan would need access to tissue samples that no longer existed. However, as already explained, there is no indication in the record that, had Carroll timely disclosed the autopsy report, Nissan would have gained access to any additional material that would have benefited its ability to prepare for trial. Therefore, Nissan failed to establish that Carroll's failure to disclose the autopsy report prejudiced its ability to prepare for trial.

---

[35] Although Cook addresses whether a party engaged in spoliation by *destroying* evidence, "essentially the same consequences follow from the bad faith concealment of evidence (typically during discovery)." TEGLAND, supra, at 281.

50

No. 82245-4-I/51

Nevertheless, the trial court determined that Nissan was prejudiced by Carroll's failure to disclose the autopsy report because both Carroll's expert witnesses and Nissan's expert witnesses were deposed under the presumption that no autopsy had occurred:

> The Plaintiff's experts in this case were hired to give opinions, not knowing there was an autopsy. They based their opinions on the interrogatories and the death certificate, which falsely stated there had been no autopsy. Their opinions were based on false evidence. Defendants' experts also did not know there had been an autopsy. Plaintiff's counsel did nothing to correct this misimpression before, during, or after the experts' depositions.

Finding of Fact 29.

However, "the fact that neither party presents the testimony of an expert who examined the evidence before its destruction diminishes its importance." Cook, 190 Wn. App. at 462. Because neither party's experts were aware that an autopsy had occurred, the significance of the autopsy report was diminished.

But even were we to take Nissan at its word that it obtained the autopsy report on July 13, 2020, Leeper deposed one of Carroll's expert witnesses—Dr. Moline—on July 31, 2020, but did not question the doctor about the report. To the contrary, Leeper asked Dr. Moline two questions as if no autopsy had been performed:

> Q. Thank you. Earlier, when you were testifying, you mentioned briefly about something you would have learned -- you could have learned more *if there had been an autopsy*, and I just want to follow up a little bit on that. *To your knowledge, you had no information whether an autopsy was performed in this case, correct?*
> A. Correct.
> Q. You would have -- *had there been an autopsy*, there would be several helpful pieces of information you could have obtained from an autopsy, right?

51

(Emphasis added.)

Leeper proceeded to ask Dr. Moline several questions about the kind of asbestos used in shipyards during World War II. Then, approximately two months before trial was set to commence, Leeper attached this deposition testimony to the motion to strike Carroll's complaint in support of her argument that Nissan was prejudiced by Carroll's failure to disclose the autopsy report. In particular, Leeper claimed that, before she obtained the autopsy report, "Nissan Entities had already deposed Plaintiff's expert witnesses" and "[a]ll testified they did not know of an autopsy in this case." In support of this assertion, Leeper cited to the deposition testimony of Dr. Moline. This conduct goes far beyond a failure to mitigate—rather, Leeper engaged in an apparent tactical decision to self-create prejudice. The trial court abused its discretion by not considering this conduct.

Accordingly, the trial court erred by concluding that Nissan's ability to prepare for trial was prejudiced by Carroll's failure to disclose the autopsy report.[36]

B

We next address Carroll's response to style interrogatory 22, which requested that Carroll provide information regarding any tissue samples that

---

[36] Moreover, as previously explained, the trial court did not consider Carroll's proposal for an adverse inference jury instruction, which would have more than adequately cured any prejudice resulting from Carroll's failure to disclose the autopsy report. Indeed, the proposed instruction would have provided the jury with an additional inference that the autopsy report itself did not contain. Therefore, such an instruction would have placed Nissan in a *better* position than it would have been had Carroll disclosed the existence of the autopsy report to Nissan.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

were retained pursuant to an autopsy of Lawrence. Carroll's response to this interrogatory amounted to a discovery violation. However, because Nissan was not substantially prejudiced by Carroll's response, the trial court erred by relying on her response as a basis for granting Nissan's motion requesting the extreme sanction of striking Carroll's complaint.

Style interrogatory 22 stated:

If an autopsy was performed on decedent, were any specimens or tissue samples taken or retained? If so, identify:
(a)     The nature of the specimens or tissue samples taken or retained;
(b)     The person at whose direction such specimens or tissue samples were taken or retained;
(c)     The purpose for taking or retaining such specimens or tissue samples; and
(d)     The present location and custodian of all such specimens or tissue samples.

Carroll responded to style interrogatory 22 by stating, "Not Applicable."

The trial court found that style interrogatory 22 required disclosure of "any . . . residual tissue" and that Carroll "signed off" on the "false response[]" to this interrogatory. Finding of Fact 15. The trial court also found that "Plaintiff should have disclosed the fact of an autopsy and given opposing counsel information regarding the report, pathologist, tissue, and death certificate, but did not." Finding of Fact 23. These findings were correct.

However, Nissan does not establish prejudice in its ability to prepare for trial as a result of the answer. Indeed, the trial court found that Nissan "had located the autopsy report on their own in 2019." This report provided the name of the entity where the autopsy was performed, the name of the physician assistant who performed the autopsy (Frances Zitano), the name of the medical

doctor who signed the autopsy report (Dr. Brent Staggs), and the specific types of tissue that were retained following the autopsy. The report also stated that "[t]he family" requested that the autopsy be performed. In addition to this report, according to a declaration of Leeper, Nissan acquired "documents and 35 slides" from the autopsy.

In light of these circumstances, there are several reasons why Nissan did not establish prejudice in its ability to prepare for trial as the result of Carroll's improper response. First, because Nissan acquired the autopsy report sometime in 2019, Nissan had at least 11 months to obtain any further information regarding the autopsy before trial was ultimately set to commence on November 9, 2020. As such, Nissan was not greatly prejudiced by Carroll's response. See Burnet, 131 Wn.2d at 496.

Second, despite the significant time that remained before trial, the record contains no indication that Nissan made any effort to depose either Zitano or Dr. Staggs. The trial court erred by not considering Nissan's failure to act so as to mitigate any foreseeable prejudice in preparing for trial. See Fisons Corp., 122 Wn.2d at 356.

Finally, there is no indication in the record that Nissan would have been able to test any tissue samples had Carroll provided an entirely truthful response to style interrogatory 22. As already explained, the record is devoid of any

No. 82245-4-I/55

indication that any tissue samples that would have been useful to Nissan existed when this lawsuit commenced.[37]

Accordingly, the trial court erred by concluding that Nissan was prejudiced by Carroll's failure to provide a truthful answer to style interrogatory 22 and, thus, erred by viewing the transgression as justifying the extreme sanction of dismissing all causes of action.

C

Finally, we address the trial court's finding that "Plaintiff disclosed witnesses six weeks to six months after deadlines set in Orders Setting Civil Asbestos Case Schedules. The trial date was continued twice in part due to Plaintiff's discovery delays." Finding of Fact 26. Carroll's attorneys disclosed the list of trial witnesses to Nissan on May 29, 2019, which was six weeks after the April 15, 2019 disclosure deadline. Additionally, these attorneys disclosed the list of actual trial witnesses on February 25, 2020, which was eight weeks after the December 30, 2019 deadline. This conduct amounted to a discovery violation. However, there is no indication in the record that these delays resulted from Carroll's own conduct as opposed to the conduct of her attorneys. Moreover, when Carroll's attorneys disclosed the actual trial witnesses to Nissan, approximately eight months remained before trial was ultimately set to commence on November 9, 2020. As such, Nissan did not show that it was in

---

[37] In any event, any prejudice resulting from Nissan's inability to test any remaining tissue samples would have been more than adequately cured by adoption of Carroll's proposed adverse inference jury instruction as a remedy.

55

fact prejudiced in its ability to prepare for trial by this delay. See Burnet, 131 Wn.2d at 496.

VI

For the reasons set forth above, the trial court erred by striking Carroll's complaint. Indeed, the conduct that the trial court found to be the most damning—Carroll's failure to give notice of or retain tissue samples from an autopsy that occurred approximately two years before this litigation commenced—did not, actually, amount to a violation at all. In fact, most of the conduct that the trial court found amounted to discovery violations were not actually violations. As for the conduct that the trial court properly found to amount to discovery violations, Nissan failed to establish either that this conduct was willful or that this conduct substantially prejudiced its ability to prepare for trial. Therefore, *none* of the conduct that Carroll *herself* engaged in met all of the factors that are required to be satisfied under Burnet in order for a trial court to impose severe discovery sanctions. Accordingly, the trial court erred by punishing Carroll by imposing on her the most severe discovery sanction available. This was especially so given the availability of a lesser sanction—the adverse inference instruction—that the trial court was required to account for prior to ordering dismissal of the lawsuit. See Burnet, 131 Wn.2d at 494; Teter, 174 Wn.2d at 216-17.

To be clear, however, the trial court did not err by sanctioning Carroll's attorneys. Indeed, each of these attorneys engaged in various forms of wrongdoing, all of which was properly punished by the trial court. Most notably,

56

the trial court found that Karst both knew that an autopsy had been performed and that he was in possession of the autopsy report. This finding is supported by the record. Indeed, the autopsy was paid for with Karst's credit card. Additionally, in July 2016, Carroll's daughter, Dana, sent a copy of the autopsy report to Karst via an e-mail message.

Despite the fact Karst possessed the autopsy report and knew that an autopsy had been performed, Karst prepared for his client and submitted untruthful responses to interrogatories 21 and 22, which requested, respectively, a copy of the autopsy report and information related to any tissue samples retained from the autopsy.[38] In response to both of these interrogatories, the client's answer, prepared by Karst, was, "Not Applicable." Additionally, Karst was present at the deposition during which Douglas expressed uncertainty as to whether an autopsy occurred. Instead of informing Nissan that an autopsy had been performed, Karst remained silent. This conduct was properly punished by the trial court.

The trial court also found that Kim knew that an autopsy had been performed. Findings of Fact 10 and 16. This finding is also supported by the record. Indeed, Kim not only worked closely with Karst on this case, but he was also an attorney at Karst's law firm. In a declaration, an employee at an information technology consulting company hired by Karst's law firm stated that all of the firm's e-mails were stored on the firm's server. As such, there is

---

[38] Lawyer Karst was responsible for his own actions and those of his staff, associates, and partners.

57

sufficient support in the record that Kim both had access to the autopsy report and knew that an autopsy had been performed.[39]

Even though Kim knew that an autopsy had been performed, Kim did not disclose the existence of the autopsy report to Nissan during Carroll's deposition. Instead, Kim remained silent when Carroll expressed uncertainty as to whether an autopsy was performed. This conduct was also properly punished by the trial court.

Finally, the trial court properly sanctioned Owens as well. Although the trial court did not find that Owens knew that an autopsy had been performed, Owens was the only one of these three lawyers who was a local member of the Washington bar. As such, Owens was, to some degree, responsible for the misconduct of Karst and Kim. See APR 8(b)(ii).[40] Furthermore, the trial court

---

[39] When a lawyer works closely on a case with an associated lawyer who possesses information about a fact, that lawyer may be presumed to also possess this information. Indeed, under the Rules of Professional Conduct (RPC), a lawyer's knowledge of a fact may be inferred from the circumstances. RPC 1.0A(f). Furthermore, the Restatement (Third) of the Law Governing Lawyers (Am. Law Inst. 2000) provides that a lawyer may be presumed to possess information that is in the possession of a lawyer with whom they are closely associated:

> If the facts warrant, a finder of fact may infer that the lawyer gained information possessed by other associated lawyers, such as other lawyers in the same law firm, where such an inference would be warranted due to the particular circumstances of the persons working together. Thus, for example, in particular circumstances it may be reasonable to infer that a lawyer who regularly consulted about a matter with another lawyer in the same law firm became aware of the other lawyer's information about a fact.

RESTATEMENT, supra, § 94 cmt. g.

[40] This rule provides:

> **(b) Exception for Particular Action or Proceeding.** A lawyer member in good standing of . . . the bar of any other state or territory of the United States or of the District of Columbia . . . may appear as a lawyer in any action or proceeding only
>
> . . .
>
> (ii) in association with an active lawyer member of the Bar, who shall be the lawyer of record therein, responsible for the conduct thereof.

APR 8.

properly held all three lawyers accountable for their failure to timely disclose witnesses to Nissan.

In light of this misconduct, the trial court properly held these attorneys accountable for their wrongdoing. Indeed, both Karst and Kim engaged in dishonest conduct by concealing the existence of the autopsy report. On remand, the trial court may elect to impose further sanctions against these attorneys. However, the record does not support a determination that Carroll herself was culpable to the degree that would warrant the dismissal of her complaint. Nor does this record support the striking of Carroll's complaint based on the actions of her lawyers.

VII

On cross appeal, Nissan contends that the trial court erred by limiting the sanction award imposed on Owens to $1,000. This is so, Nissan asserts, because Owens was required to be jointly and severally liable for his co-counsel's misconduct. Both because the trial court was not required to hold Owens jointly and severally liable and because the trial court's sanction was reasonably proportional to Owens's participation in his co-counsel's misconduct, we disagree.

When reviewing an award of attorney fees, we first review de novo whether a legal basis exists for the award. Pierce, 15 Wn. App. 2d at 446-47. We then "apply an abuse of discretion standard to a decision to award or deny attorney fees and the reasonableness of any such attorney fee award." Pierce, 15 Wn. App. 2d at 447.

Nissan asserts that, pursuant to APR 8(b)(ii), the trial court erred by not holding Owens jointly and severally liable for the fee sanctions imposed on Karst and Kim. According to Nissan, because Owens was responsible for Karst and Kim under this rule, the trial court should have held Owens jointly and severally liable for the $76,477.47 fee sanction that the court imposed on Carroll, Karst, and Kim. However, nothing in APR 8(b)(ii) requires a trial court to hold a lawyer who is an active member of the Washington bar jointly and severally liable for the misconduct of an attorney for whom he or she has assumed responsibility. Therefore, Nissan's argument is unpersuasive.

Additionally, the trial court did not abuse its discretion by limiting the attorney fee award that was imposed on Owens to $1,000. As already explained, the trial court found that Karst and Kim knew that an autopsy had been performed yet failed to disclose the existence of the autopsy report to Nissan. No similar finding was made with regard to Owens. Accordingly, the trial court acted within its discretion by imposing a lesser sanction on Owens.[41]

---

[41] Nissan also requests an award of attorney fees on appeal against Carroll pursuant to RAP 18.1(a). Because Nissan does not prevail on appeal, we deny this request.

Additionally, on October 19, 2021, Nissan filed a motion requesting that we strike Carroll's reply brief and impose sanctions on Carroll pursuant to RAP 10.7. Because Carroll's reply brief conforms with the rules of appellate procedure, we deny Nissan's motion. In an answer to Nissan's motion, Carroll suggests that Nissan's motion should be stricken. To the extent that Carroll requests that we strike Nissan's motion, we deny this request.

Finally, on January 26, 2022, Nissan filed a letter to address certain factual questions raised at oral argument. The following day, Carroll filed a motion to strike Nissan's letter, asserting that the letter amounted to an unauthorized supplemental brief in violation of RAP 10.1. Because Nissan's letter did not amount to an unauthorized supplemental brief and was limited to addressing factual questions raised at oral argument, we deny Carroll's motion.

Affirmed in part, reversed in part, and remanded for further proceedings

consistent with this opinion.

Duya, J.

WE CONCUR:

Andrus, C.J.